OWASSO INDEPENDENT SCHOOL DISTRICT NO.
I-011, AKA OWASSO PUBLIC SCHOOLS, ET AL.
*v.* FALVO, PARENT AND NEXT FRIEND OF HER
MINOR CHILDREN, PLETAN, ET AL.

No. 00-1073.   Argued November 27, 2001—Decided February 19, 2002

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SOUTER, THOMAS, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 436.

*Jerry A. Richardson* argued the cause for petitioners. With him on the briefs was *Karen L. Long.*

*Deputy Solicitor General Kneedler* argued the cause for the United States as *amicus curiae* urging reversal. With

him on the brief were *Solicitor General Olson, Acting Assistant Attorney General Schiffer, Beth S. Brinkmann, Mark B. Stern,* and *Colette G. Matzzie.*

*Will K. Wright, Jr.,* argued the cause for respondent. With him on the brief were *John W. Whitehead* and *Steven H. Aden.**

JUSTICE KENNEDY delivered the opinion of the Court.

Teachers sometimes ask students to score each other's tests, papers, and assignments as the teacher explains the correct answers to the entire class. Respondent contends this practice, which the parties refer to as peer grading, violates the Family Educational Rights and Privacy Act of 1974 (FERPA or Act), 88 Stat. 571, 20 U. S. C. § 1232g. We took this case to resolve the issue.

I

Under FERPA, schools and educational agencies receiving federal financial assistance must comply with certain conditions. § 1232g(a)(3). One condition specified in the Act is that sensitive information about students may not be released without parental consent. The Act states that federal funds are to be withheld from school districts that have "a policy or practice of permitting the release of education records (or personally identifiable information contained

---

*Briefs of *amici curiae* urging reversal were filed for the National Education Association et al. by *Robert H. Chanin* and *Andrew D. Roth;* for the National School Boards Association et al. by *Julie Underwood, Julie E. Lewis, Sheldon E. Steinbach,* and *Martin Michaelson;* for the Oklahoma Education Association by *Richard B. Wilkinson* and *Brandon R. Webb;* and for the Reporters Committee for Freedom of the Press et al. by *Gregg P. Leslie, Lucy A. Dalglish,* and *S. Mark Goodman.*

Briefs of *amici curiae* urging affirmance were filed for the Capitol Resource Institute et al. by *Richard D. Ackerman* and *Gary G. Kreep;* for the Council of Counseling Psychology Training Programs et al. by *Dennis Owens;* and for the Eagle Forum Education & Legal Defense Fund by *Karen Tripp* and *Phyllis Schlafly.*

therein . . .) of students without the written consent of their parents." § 1232g(b)(1). The phrase "education records" is defined, under the Act, as "records, files, documents, and other materials" containing information directly related to a student, which "are maintained by an educational agency or institution or by a person acting for such agency or institution." § 1232g(a)(4)(A). The definition of education records contains an exception for "records of instructional, supervisory, and administrative personnel . . . which are in the sole possession of the maker thereof and which are not accessible or revealed to any other person except a substitute." § 1232g(a)(4)(B)(i). The precise question for us is whether peer-graded classroom work and assignments are education records.

Three of respondent Kristja J. Falvo's children are enrolled in Owasso Independent School District No. I–011, in a suburb of Tulsa, Oklahoma. The children's teachers, like many teachers in this country, use peer grading. In a typical case the students exchange papers with each other and score them according to the teacher's instructions, then return the work to the student who prepared it. The teacher may ask the students to report their own scores. In this case it appears the student could either call out the score or walk to the teacher's desk and reveal it in confidence, though by that stage, of course, the score was known at least to the one other student who did the grading. Both the grading and the system of calling out the scores are in contention here.

Respondent claimed the peer grading embarrassed her children. She asked the school district to adopt a uniform policy banning peer grading and requiring teachers either to grade assignments themselves or at least to forbid students from grading papers other than their own. The school district declined to do so, and respondent brought a class action pursuant to Rev. Stat. § 1979, 42 U. S. C. § 1983 (1994 ed., Supp. V), against the school district, Superintendent Dale

Johnson, Assistant Superintendent Lynn Johnson, and Principal Rick Thomas (petitioners). Respondent alleged the school district's grading policy violated FERPA and other laws not relevant here. The United States District Court for the Northern District of Oklahoma granted summary judgment in favor of the school district's position. The court held that grades put on papers by another student are not, at that stage, records "maintained by an educational agency or institution or by a person acting for such agency or institution," 20 U. S. C. § 1232g(a)(4)(A), and thus do not constitute "education records" under the Act. On this reasoning it ruled that peer grading does not violate FERPA.

The Court of Appeals for the Tenth Circuit reversed. 233 F. 3d 1203 (2000). FERPA is directed to the conditions schools must meet to receive federal funds, and as an initial matter the court considered whether the Act confers a private right of action upon students and parents if the conditions are not met. Despite the absence of an explicit authorization in the Act conferring a cause of action on private parties, the court held respondent could sue to enforce FERPA's terms under 42 U. S. C. § 1983. 233 F. 3d, at 1211–1213. Turning to the merits, the Court of Appeals held that peer grading violates the Act. The grades marked by students on each other's work, it held, are education records protected by the statute, so the very act of grading was an impermissible release of the information to the student grader. *Id.*, at 1216.

We granted certiorari to decide whether peer grading violates FERPA. 533 U. S. 927 (2001). Finding no violation of the Act, we reverse.

## II

At the outset, we note it is an open question whether FERPA provides private parties, like respondent, with a cause of action enforceable under § 1983. We have granted certiorari on this issue in another case. See *Gonzaga Univ.* v. *Doe, post,* p. 1103. The parties, furthermore, did

not contest the § 1983 issue before the Court of Appeals. That court raised the issue *sua sponte,* and petitioners did not seek certiorari on the question. We need not resolve the question here as it is our practice "to decide cases on the grounds raised and considered in the Court of Appeals and included in the question on which we granted certiorari." *Bragdon* v. *Abbott,* 524 U. S. 624, 638 (1998). In these circumstances we assume, but without so deciding or expressing an opinion on the question, that private parties may sue an educational agency under § 1983 to enforce the provisions of FERPA here at issue. Though we leave open the § 1983 question, the Court has subject-matter jurisdiction because respondent's federal claim is not so "completely devoid of merit as not to involve a federal controversy." *Steel Co.* v. *Citizens for Better Environment,* 523 U. S. 83, 89 (1998) (citation omitted). With these preliminary observations concluded, we turn to the merits.

The parties appear to agree that if an assignment becomes an education record the moment a peer grades it, then the grading, or at least the practice of asking students to call out their grades in class, would be an impermissible release of the records under § 1232g(b)(1). Tr. of Oral Arg. 21. Without deciding the point, we assume for the purposes of our analysis that they are correct. The parties disagree, however, whether peer-graded assignments constitute education records at all. The papers do contain information directly related to a student, but they are records under the Act only when and if they "are maintained by an educational agency or institution or by a person acting for such agency or institution." § 1232g(a)(4)(A).

Petitioners, supported by the United States as *amicus curiae,* contend the definition covers only institutional records—namely, those materials retained in a permanent file as a matter of course. They argue that records "maintained by an educational agency or institution" generally would include final course grades, student grade point averages,

standardized test scores, attendance records, counseling records, and records of disciplinary actions—but not student homework or classroom work. Brief for Petitioners 17; Brief for United States as *Amicus Curiae* 14.

Respondent, adopting the reasoning of the Court of Appeals, contends student-graded assignments fall within the definition of education records. That definition contains an exception for "records of instructional, supervisory, and administrative personnel . . . which are in the sole possession of the maker thereof and which are not accessible or revealed to any other person except a substitute." § 1232g(a)(4)(B)(i). The Court of Appeals reasoned that if grade books are not education records, then it would have been unnecessary for Congress to enact the exception. Grade books and the grades within, the court concluded, are "maintained" by a teacher and so are covered by FERPA. 233 F. 3d, at 1215. The court recognized that teachers do not maintain the grades on individual student assignments until they have recorded the result in the grade books. It reasoned, however, that if Congress forbids teachers to disclose students' grades once written in a grade book, it makes no sense to permit the disclosure immediately beforehand. *Id.*, at 1216. The court thus held that student graders maintain the grades until they are reported to the teacher. *Ibid.*

The Court of Appeals' logic does not withstand scrutiny. Its interpretation, furthermore, would effect a drastic alteration of the existing allocation of responsibilities between States and the National Government in the operation of the Nation's schools. We would hesitate before interpreting the statute to effect such a substantial change in the balance of federalism unless that is the manifest purpose of the legislation. This principle guides our decision.

Two statutory indicators tell us that the Court of Appeals erred in concluding that an assignment satisfies the definition of education records as soon as it is graded by another student. First, the student papers are not, at that stage,

"maintained" within the meaning of § 1232g(a)(4)(A). The ordinary meaning of the word "maintain" is "to keep in existence or continuance; preserve; retain." Random House Dictionary of the English Language 1160 (2d ed. 1987). Even assuming the teacher's grade book is an education record— a point the parties contest and one we do not decide here— the score on a student-graded assignment is not "contained therein," § 1232g(b)(1), until the teacher records it. The teacher does not maintain the grade while students correct their peers' assignments or call out their own marks. Nor do the student graders maintain the grades within the meaning of § 1232g(a)(4)(A). The word "maintain" suggests FERPA records will be kept in a filing cabinet in a records room at the school or on a permanent secure database, perhaps even after the student is no longer enrolled. The student graders only handle assignments for a few moments as the teacher calls out the answers. It is fanciful to say they maintain the papers in the same way the registrar maintains a student's folder in a permanent file.

The Court of Appeals was further mistaken in concluding that each student grader is "a person acting for" an educational institution for purposes of § 1232g(a)(4)(A). 233 F. 3d, at 1216. The phrase "acting for" connotes agents of the school, such as teachers, administrators, and other school employees. Just as it does not accord with our usual understanding to say students are "acting for" an educational institution when they follow their teacher's direction to take a quiz, it is equally awkward to say students are "acting for" an educational institution when they follow their teacher's direction to score it. Correcting a classmate's work can be as much a part of the assignment as taking the test itself. It is a way to teach material again in a new context, and it helps show students how to assist and respect fellow pupils. By explaining the answers to the class as the students correct the papers, the teacher not only reinforces the lesson but also discovers whether the students have understood

the material and are ready to move on. We do not think FERPA prohibits these educational techniques. We also must not lose sight of the fact that the phrase "by a person acting for [an educational] institution" modifies "maintain." Even if one were to agree students are acting for the teacher when they correct the assignment, that is different from saying they are acting for the educational institution in maintaining it.

Other sections of the statute support our interpretation. See *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme"). FERPA, for example, requires educational institutions to "maintain a record, kept with the education records of each student." § 1232g(b)(4)(A). This record must list those who have requested access to a student's education records and their reasons for doing so. *Ibid.* The record of access "shall be available only to parents, [and] to the school official and his assistants who are responsible for the custody of such records." *Ibid.*

Under the Court of Appeals' broad interpretation of education records, every teacher would have an obligation to keep a separate record of access for each student's assignments. Indeed, by that court's logic, even students who grade their own papers would bear the burden of maintaining records of access until they turned in the assignments. We doubt Congress would have imposed such a weighty administrative burden on every teacher, and certainly it would not have extended the mandate to students.

Also, FERPA requires "a record" of access for each pupil. This single record must be kept "with the education records." This suggests Congress contemplated that education records would be kept in one place with a single record of access. By describing a "school official" and "his assistants" as the personnel responsible for the custody of the records,

FERPA implies that education records are institutional records kept by a single central custodian, such as a registrar, not individual assignments handled by many student graders in their separate classrooms.

FERPA also requires recipients of federal funds to provide parents with a hearing at which they may contest the accuracy of their child's education records. § 1232g(a)(2). The hearings must be conducted "in accordance with regulations of the Secretary," *ibid.*, which in turn require adjudication by a disinterested official and the opportunity for parents to be represented by an attorney. 34 CFR § 99.22 (2001). It is doubtful Congress would have provided parents with this elaborate procedural machinery to challenge the accuracy of the grade on every spelling test and art project the child completes.

Respondent's construction of the term "education records" to cover student homework or classroom work would impose substantial burdens on teachers across the country. It would force all instructors to take time, which otherwise could be spent teaching and in preparation, to correct an assortment of daily student assignments. Respondent's view would make it much more difficult for teachers to give students immediate guidance. The interpretation respondent urges would force teachers to abandon other customary practices, such as group grading of team assignments. Indeed, the logical consequences of respondent's view are all but unbounded. At argument, counsel for respondent seemed to agree that if a teacher in any of the thousands of covered classrooms in the Nation puts a happy face, a gold star, or a disapproving remark on a classroom assignment, federal law does not allow other students to see it. Tr. of Oral Arg. 40.

We doubt Congress meant to intervene in this drastic fashion with traditional state functions. Under the Court of Appeals' interpretation of FERPA, the federal power would exercise minute control over specific teaching methods and

instructional dynamics in classrooms throughout the country. The Congress is not likely to have mandated this result, and we do not interpret the statute to require it.

For these reasons, even assuming a teacher's grade book is an education record, the Court of Appeals erred, for in all events the grades on students' papers would not be covered under FERPA at least until the teacher has collected them and recorded them in his or her grade book. We limit our holding to this narrow point, and do not decide the broader question whether the grades on individual student assignments, once they are turned in to teachers, are protected by the Act.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring in the judgment.

I agree with the Court that peer-graded student papers do not constitute "education records" while they remain in the possession of the peer grader because, as the Court explains, a student who grades another's work is not "a person acting for" the school in the ordinary meaning of that phrase. *Ante,* at 432, 433. I cannot agree, however, with the other ground repeatedly suggested by the Court: that education records include only documents kept in some central repository at the school. *Ante,* at 433 ("The word 'maintain' suggests FERPA records will be kept in a filing cabinet in a records room at the school or on a permanent secure database . . . . It is fanciful to say [student graders] maintain the papers in the same way the registrar maintains a student's folder in a permanent file"), 435 ("FERPA implies that education records are institutional records kept by a single central custodian, such as a registrar . . .").

As the Court acknowledges, *ante,* at 429, 432, Congress expressly excluded from the coverage of FERPA "records of

instructional . . . personnel . . . which are in the sole posses-sion of the maker thereof and which are not accessible or revealed to any other person except a substitute," 20 U. S. C. § 1232g(a)(4)(B)(i). Respondent argues that this exception, which presumably encompasses many documents a teacher might create and keep in the classroom, including a grade book, would be rendered superfluous if education records included only "institutional records kept by a single central custodian, such as a registrar." We do not, of course, read statutes in such fashion as to render entire provisions inop-erative. *United States* v. *Nordic Village, Inc.*, 503 U. S. 30, 35–36 (1992).

The Court does not explain why respondent's argument is not correct, and yet continues to rely upon the "central custodian" principle that seemingly renders the exception for "records of instructional . . . personnel" superfluous. Worse still, while thus relying upon a theory that plainly excludes teachers' grade books, the Court protests that it is not decid-ing whether grade books are education records, *ante*, at 433. In my view, the Court's endorsement of a "central custodian" theory of records is unnecessary for the decision of this case, seemingly contrary to § 1232g(a)(4)(B)(i), and (when com-bined with the Court's disclaimer of any view upon the status of teachers' grade books) incurably confusing. For these reasons, I concur only in the judgment of the Court.